Good morning. Ralph O'Neill for Appellants, Defendants, Lahaina Divers, Inc. and Corey Dam. I'd like to reserve three minutes for rebuttal, please. If it pleases the Court, the question of whether Section 9 of Chapter 305 of Title 46 applies to both point-to-point transportation and also point-to-point transportation plus a voyage transporting passengers that simply departs from a domestic port is found right in the language of the statute, the plain meaning. The lawmaking branch of government chose to use both the singular and the plural of the word port. I'm going to flip the order of Section 9. I'm referring to Section 9 because it's Chapter 305. It's a little easier. I'll flip the order, but it doesn't matter. On the one hand, Section 9 applies if a vessel transports passengers between a domestic singular port and a foreign singular port. On the other, Section 9 applies if a vessel transports passengers between plural domestic ports. Well, but, you know, one of the fundamental provisions that applies to the U.S. Code and the so-called Dictionary Act in 1 U.S.C. Section 1 says that words importing—unless the context indicates otherwise— words importing the plural include the singular. So then the question is, does the context of this statute suggest that Congress meant to give load-bearing weight to whether or not it is one U.S. port to a different U.S. port, ports in that sense, or one port of departure and one port of arrival, perhaps the same port? And what about the context of this suggests that the plural was meant to exclude the round-trip excursion? The plain meaning of the word between and Congress's intentional selection of the word ports. This is exactly why the context here indicates that it mattered to Congress because they chose both singular and plural forms. But you go between ports in a literal sense. If you get on the boat at one point, you go out into the water all around, and then you come back to the port. You have gone between ports. It's the same port, but you went from a port of departure to a port of return. Well, this is why the courts that have interpreted this, as the cases we've cited, indicate that the statute applies to common carriers transporting passengers between two different locations. And, again, the argument we have on this is simply the intentional use of both singular and plural to indicate the context. Didn't this language show up in this statute because the Second Circuit had held that a trip that had no arrival or departure in the United States but with a ticket had been sold here, and it was a trip from Montreal to, I think, to Liverpool, and that was held to be governed by U.S. law. So doesn't this kind of language just suggest, well, this needs to be about shipping and passengers departing in and out of U.S. ports? Doesn't that seem to be what this is about? And so why would we attach significance to whether or not the port you arrive and depart from is the same port? Our position on that is the plain language. These are common everyday words that are, you know, you might call them supermarket words. And the plain meaning here is Congress chose singular for the domestic and foreign and plural for domestic, which means between two different words. Well, you can't have the plural in the foreign clause because if it's going from a U.S. port to a foreign port and you describe them separately, they're both going to be singular. But with domestic, you just use the words ports, but the background rule in the Dictionary Act is that the singular includes the plural, and unless the context indicates that it makes a difference, we normally don't attach significance to plural versus singular. And it doesn't make a lot of sense from any kind of policy point of view to say that you have one rule of liability if you take passengers, you know, from San Francisco over to Oakland across the Bay, then you can take them from San Francisco, go to Oakland, come back and get back to San Francisco, and then that should have a different liability rule. That doesn't make a lot of substantive sense. Well, at this point, though, I mean, given the policy arguments have to give way to the plain meaning. And, yes, it is not, if we're talking about absurd... But the plain meaning, I keep going back to it, the plain meaning is that unless there's something about the context that says otherwise, we do not attach weight to plural versus singular. And I just, the context suggests it would make no sense to attach weight to it. The code tells us not to attach weight to it unless something says that Congress meant to attach weight to it. And that's what I'm missing. Maybe you can help me out. Show me why Congress, what about the context of the statute said Congress meant to depart from the normal rule that we don't give this kind of load-bearing weight to the use of the plural. I have nothing more to submit except to point to the intentional use of both the singular and plural in that language in subsection A of section 9. That's the context. They had the, they intentionally chose those words. I don't think we can stray from the text of the statute itself. The similar statute, section 8, has similar language in it. But as far as context goes, we're submitting it's the use of singular plural. Are you also arguing that this waiver really applies to common carriers and not to recreational vehicles? Exactly. The intent here, and this is what most courts across the country, in fact all courts that have reached this issue except for the decisions in the District of Hawaii, have held that this statute applies to common carriers. The Central District of California decision, Cherney, from 1964, it's a district court decision but it describes the statute as applying to common carriers. We've cited multiple other decisions that limit this to common carriers. And the court's comment brings up the In Re Royal Caribbean case because in that case the court pointed out as a hypothetical. Let's say Royal Caribbean owns a small fishing boat and they charter that and the boat has nothing whatsoever to do with a cruise. In that decision the court said that undoubtedly section 9 would prohibit Royal Caribbean from including or enforcing a waiver of liability for the use of the charter boat. It's undisputed in this case our clients are not common carriers. Plaintiff isn't making that argument. This is purely a voluntary recreational excursion. What does the statute suggest? It doesn't use the word common carrier. So what does the statute indicate that it's intended only for common carriers? The language that we submit supports that interpretation in which the cases that we've cited agree with is the language we've been discussing, which is a vessel transporting passengers between domestic ports or between a domestic port and a foreign port. Suppose there's a company that offers excursions from Port A and they go scuba diving. But part of the excursion is we'll stop at Port B. We're going to have lunch because they have really good crab cakes there. And then after you're done you go back to Port A. Would that statute apply here because you have two different ports? So at that point passengers have been transported between two different ports. So, yes, under applying the terms of that statute, the statute would be triggered. And, in fact, that would be a little bit odd. I mean it just means because you stop at another place to get a good lunch instead of returning back that it applies, whereas if you just go scuba diving and come back it doesn't. I think we're stuck with the literal language of the statute at that point. Are you saying in response to Judge Lee's question that in that hypothetical where they leave Port A, they go scuba diving and then they go for the crab cakes at Port B, that the statute and its prohibition on waivers of liability would apply with respect to the scuba diving activity that took place before they get to Port B? Well, you know, the factual question. So, yes, partially. Let me say that first. The factual question of how this particular release applied to the circumstances here, we never got to because the ruling was that Section 9 rendered it void. But under the literal language, if a vessel is transporting passengers between two different ports, that triggers Section 9. And that's actually exactly what happened in the horrible General Slocum situation. The vessel was moving from Port A to Port B. It was not on an out-and-back recreational excursion. They were headed to a port. Now, the exact history of what happened there is not clear from the record, but that's, you know, we put those citations. It was going in a port from Manhattan to Long Island, right? Correct. And there was a port in Long Island to which it was going? Yes. They were getting off for lunch or picnic or whatever, but that's exactly the hypothetical which Judge Lee has put. Exactly. Exactly. So the point here about whether there's an absurd or odd result comes up in response to the Court's questions. And we are, yes, submitting that. If there is a water taxi or a ferry that plies the waters of Puget Sound between Bainbridge Island and downtown Seattle for commuters, Section 9 applies. On the other hand, if passengers get aboard a whale-watching trip in the Port of Anchorage and they go south into the rough waters of the Gulf of Alaska to spend a day looking for whales and other marine mammals, the statute, by its plain terms, does not apply to that recreational excursion. I'm getting into my rebuttal already. Okay, so the premise of plaintiff's argument that that is absurd or odd is to assume that the legislative intent was to apply this to both. Legislative history cannot be used to create ambiguity. Briefly point to—I'm using up, I realize, my rebuttal. Briefly point to the Coast Guard Authorization Act of 1996. The Congress referred to the section that partially amended Section 9 as the cruise ship liability provision in that act. Now what does that tell us? This was the Coast Guard—we've cited this law in our reply brief. It's the Coast Guard Authorization Act of 1996, which refers to the section that amended Subsection 9 of Chapter 305 as the quote-unquote cruise ship liability act. Again, cruise ships undoubtedly are common carriers. Our clients are not. Our clients are operators of recreational excursions. So it applies Section 9 to cruise ships. That's what is stated, yes, in the Coast Guard Authorization Act of 1996. Whether they go—cruise ships, whether they go between ports or not? Cruise ship operators, in the Royal Caribbean case, the court held that if you are a cruise ship operator, you are a common carrier, and this statute applies to you no matter what you do. That's the hypothetical in which a cruise line owns a fishing vessel and charters it. In the Royal Caribbean case, cited in both sides' briefs, the court said that that would—Section 9 would apply. I've got 50 seconds of rebuttal, so I should stop there unless the court has any other questions. I'll give you two minutes for rebuttal. Thank you, Your Honor. Okay. So we'll hear now from Mr. Hilsman. Yes, Your Honor. Okay. Judge Collins, it's a pleasure to meet you, Judge Bey. It's a pleasure to see you again. This court is obviously very well prepared. I've come primarily to answer any questions the court might have, not to repeat what we've set forth in our briefs. I would like to respond very quickly to two points and also to make a third for the record. This statute, the provision barring exculpatory clauses, was initially acted as Section 183C of 46 U.S.C. When we briefed this case, it was codified as 46 U.S.C. Section 30509. Last December, it was recodified without change as 46 U.S.C. 30527. That doesn't have a substantive effect on anything, but I just think it should be clear from the record because it's not clear from the briefs. The points that I wanted to add with respect to my opponent's arguments are briefly these. As I understood his original argument, the plain language of Section 30509 applied only to what he called essential vessels, common carriers. There's nothing in the plain language of Section 30509 which so much as mentions common carriers. As I understood his arguments, the plain language of Section 30509 somehow excluded recreational vessels. There's no such carve-out in the plain language of Section 30509. It makes no reference to recreational vessels. Indeed, cruise ships take passengers on recreational excursions. So clearly, even by counsel's own arguments, this section applies to cruises like this. I think the third point that I want to make initially is this. Even if we accept LDI's arguments, this court has the ability to affirm the decision below on any reasonable basis that appears in the record. We needn't go any further than the fact that this vessel was stipulated, if not stipulated, by judicial admission. There's no question that the Dauntless is a common carrier engaged in transporting passengers between the Port of Lahaina and the Port of Molokini. There's really no reason to go beyond those facts, but I hope the court does because, quite frankly, Judge Collins is— Mr. Hillsman, I'm not following you. You're referring to a stipulation which says— No, Your Honor. Forgive me. I'm referring to the record, and I'll cite it for the court. Would you kindly tell me exactly what you're referring to? Yes, sir. At ER 110, paragraph 4, Lahaina Divers admits that the decedent was a passenger for hire, Mrs. Ehart, was a passenger for hire aboard the dive vessel Dauntless. At ER 112, paragraph 10, LDI admits that the Dauntless departed Lahaina on the morning of the accident with 14 other paying passengers for the crescent-shaped islet of Molokini. Those are judicial admissions in the record. Where's the judicial admission that it's going from one port to another port? This is the judicial admission that the vessel was a common carrier. I don't think that's critical, but there's a judicial admission of that effect. The only difference— They didn't use those terms in what you—but you say that that spells common carriage. Exactly. There's only two types of carriage—private carriage, which is a charter, or common carriage, where individual passengers pay fares. That goes to their argument that it doesn't apply to recreational, because they say they were a common carrier. All right. I've got you. And with respect to the port of Molokini— Can you— Yes, sir. Please. If you can focus on the text of Section 3059, the language between ports. And I take it you're taking a more literal reading of that language, but, I mean, shouldn't we adopt a more reasonable, common usage of the term between? Because if you think of the word between, it usually means two separate things. So if someone said, I went shopping and I shuttled between homes, I think you would say this person is wealthy and owns two homes and went between his or her two homes. Not, I went to Target, went back to my home. I mean, it seems like a very odd way to say that. So the word between—I mean, you think of, as a kid, between means two separate things. Among is three or more. That's the ambiguity in the statute. And Judge Collins stole my thunder on this. There's no question that under the 1 U.S.C. 1, the Dictionary Act, that unless the context indicates otherwise, Congress, when it uses the plural, it's assumed to use the singular as well. But even aside from plural versus singular, I mean, the word between in itself inherently—I mean, at least in a common usage—suggests it's two separate things. Here's my reply to that, Your Honor. The ambiguity arises from the word between in this context. When one uses the word between to refer to space or time, it's an interval. It's an interstice. It's an intermediary position between two endpoints. There's nothing about the concept or the statute and nothing in the context of 30509 that suggests that the endpoints have to be different. For example, the distance, the circumference of a circle is the clockwise or counterclockwise distance between a point anywhere on the periphery and the same point. As Judge Collins pointed out, that's also true of any time a vessel goes to sea. With the exception of the Flying Dutchman, any vessel which is at sea is by definition between ports. It may not always be different ports. If Congress had intended it to be different ports, it could have used the phrase different ports. It didn't. It used the term ports, which in this instance has to include the single unless the context indicates otherwise. Here, I think the context clearly indicates that they were contemplating the very hypothetical that you posed, Your Honor, and that Judge Collins posed as well. The real critical question here is do the passengers and does the owner of a vessel like this know at the outset of the voyage whether 30509 is going to apply or not? To take an obvious example, if a vessel is departing from the Port of Honolulu and headed for Nauwiwiwi, and after leaving the harbor, a passenger is injured, so it returns to the Port of Honolulu. Let's say it's injured because of the negligence of the vessel. It then returns to the Port of Honolulu. Does that take it outside Section 30509? That couldn't be possible. To take a hypothetical that we explored in the footnote of the brief, let's assume that a group of passengers boards a vessel at the Alawai Harbor here in Honolulu. They're going charter fishing. They go outside. They don't catch a fish. They return to the Alawai, the same port from which they departed. Another group goes out, catches a fish, and instead of going back to the hotel, goes to Koala Basin to weigh it. That suddenly fits it in 30509. The passengers in the morning didn't know whether they were going to be under 30509 or not under counsel's interpretation. That's an absurd result. It can't possibly be what Congress had in mind. The plain meaning rule, it's a key, not a keyhole. It's meant to unlock the language of the statute, not to blinker the court. The Supreme Court has made it clear that the plain meaning rule is to be applied from three sources. You look at the language Congress used. You look at the specific context in which that language was used. You look at the broader context of the statute as a whole. Well, clearly, this statute was designed to make sure that passengers who were either calling or were sailing to or from an American port could not contractually waive their right to seek compensation for an injury. That's the purpose of the statute. The absurdity that results, as I just explained with these hypotheticals, is if 30509 is to be interpreted the way LDI says, one doesn't know on any given voyage whether it's going to apply or not. The other absurdity, as Judge Collins pointed out, is in Wallace. No. If you're going between San Francisco and Los Angeles and the ship has to turn around because of an injury, the ticket is sold between San Francisco and Los Angeles. You're going between two ports. It doesn't speak in terms of the ticket, Your Honor. It says a vessel transporting passengers between ports. The vessel was transporting passengers between San Francisco and Los Angeles. Well, that's the other rub, and that's the other ambiguity. If it is ambiguous, do we apply Chevron? Chevron. I'm sorry, Your Honor. Never mind. I hope the clerks picked that one. I'm sorry. The ambiguity here is, again, whether ports truly requires that there be two different ports. And I think common sense tells us that any time a vessel is at sea, it's between ports. The irony of a situation that I believe Judge Collins was alluding to the Wallace case, which was the case where the passenger boarded in Greece and the vessel had never called on a U.S. port. Any time a vessel calls on one U.S. port, any time a foreign flag vessel calls on one U.S. port, 30509 applies. That's the Henson case. In Henson, the plaintiff was injured in Canadian waters, and the vessel had departed from, I believe, a port someplace in Canada and was headed for the United States. The fact that the port was headed for one port in the United States made 30509 apply. How then could a— I was referring, just for the record, to the Ocean Steam v. Corcoran case from 1925, in which someone going from Montreal to Liverpool purchased the ticket in Boston, and U.S. law was applied, and the common law rule that's codified in this statute was applied, even though it never touched a U.S. port. And then in 1936, when this is codified, that language shows up, clearly would abrogate the result in this case with a vigorous dissent in the case. And so it raises the inference that when the language was added in 1936, they had in mind the 1925 statute from the—or case from the Second Circuit and made clear that it's got to touch a U.S. port. And as I said, the court is remarkably well prepared, and that is exactly the point I'm trying to make. In that case and in the Henson case, it's clear that so long as the—and in the Wallace case, so long as a foreign vessel touches one U.S. port, a one U.S. port, 30509 applies. But why then is it possible—why do we require a domestic vessel, an American flag vessel, that spends its entire operational life in U.S. waters, to call in two ports for the statute to apply? It's just—if not an absurdity, it's an odd result. And where you have odd results like that, the plain meaning rule says that we must construe the language in the broader context of the statute as a whole to reinforce the purpose of the language—of the statute, not to defeat it. If the purpose of this statute is to ensure that passengers do not contractually give up their right to seek compensation for an injury to a cruise during a voyage, it makes no sense to have a situation like the one I just described. As I said, I've come primarily to answer any questions the Court has, and I'm anxious to hear any others that you may have. Question about the alternative argument you raised in your brief on the Hawaii statute. Yes, sir. And it seemed to me that the district court had assumed that the statute would apply, but as I read the order, it said that you did not satisfy the elements of the statute in order to actually trigger it. And I didn't see in your brief where you explained why the district court was wrong in reaching that conclusion. Well, I'm reluctant to disagree with Judge Mulway on anything in this matter, but we do disagree with her. No, but my point is you didn't explain in the brief, and so it seems to me the whole point is forfeited because you can't raise an alternative ground that the district court has stated it rejects on particular reasons and not explain why you believe those reasons to be wrong, and I did not see that in the red brief. If I'm missing something, then perhaps it's your chance to set me straight. Perhaps it's because we relied on Judge Kaye's decision in Hambrook. That took a position very different than the one that Judge Mulway took. In the Hambrook case, Judge Kaye realized that the subsection A of 663-154 makes any release purporting to waive negligence illegal under Hawaii law. And it indicates that notwithstanding that provision, that a release can be effective, which deals with inherent risks. But in that instance, the plaintiff must prove that the owners and operators explained the inherent risks associated. Judge Mulway, at least as I understood her decision, said that she wasn't applying 663-154 because there were still some factual determinations to be made as to whether or not the inherent risks were discussed with the EHARTS and that that wasn't playing on the record. This discussion, you know, it's a two-page discussion on 53 and 54 of your brief. It never even mentions what Judge Mulway said about this, much less explain why it was wrong. We ceded much of that to Professor Sterling in the amicus brief. Well, it's got to be in your main brief where it's forfeited. I understand. And so I'm not really seeing it here in this brief. I hope the court doesn't have to reach that issue. It's an issue that the court reaches only if it concludes that 30509 does not apply. But I believe that we made it clear that under Yamaha, 663-1.54 could be applied to fill a gap. I believe we made it clear that if 30509 does not apply, then there is exactly such a gap in the maritime law. And I believe and hope we made it clear that there is nothing inherently conflicting about 663-154 and general maritime law, that they both indeed serve the same purpose in this instance, and that is to ensure that passengers are, in the broader context of the Hawaii law, customers of certain operations do not forfeit their right to seek compensation for injuries that occur during a voyage or during a recreational experience. All right. Thank you, counsel. Thank you, Your Honor. To reiterate, between provides the context on this singular plural issue. That's the essence of our argument. Between is not an ambiguous word. That's a plain, ordinary, common, everyday word. On the injury hypothetical, the vessel that departs from Port A to Port B and then turns around back to Port A, that makes absolutely no sense if that points to an absurd outcome. The ticket was sold. The itinerary was to go from A to B. The statute applies. There's no further discussion that needs to be had on that. As far as Molokini, counsel refer, appellees refer to Molokini as a port, the district court judge in the order specifically says she's not reaching that issue in her decision. We've cited that in the excerpt of records. What is your position on that question? Molokini is not a port. Molokini is the tip of a volcano, a crescent, something like a crescent moon, sitting above the water that has some shallow waters. It's certainly not an anchorage. If you drop an anchor there, you're probably going to be arrested by state authorities, because that is a coral preservation area. There are moorings to which permitted vessels, commercial vessels, may tie up. There is no land. People aren't even permitted to go onto land. There's just none of the structure, none of the facilities of a port. After the boat leaves the port from which it departs, it never arrives at another port until it comes back to the same port from which it departed, correct? That is our situation precisely in this case. The court, on the potential application of the state statute, the court specifically found that there was an issue of fact at the district court level and didn't reach that. Finally, the very first time in this case that plaintiff or the court has ever attempted to characterize my clients as a common carrier occurred five or ten minutes ago. I wish I had more time left, because I would actually prefer, if counsel for Appelese is asked the question, there will be no place in the record where he can point to any allegation or fact determination that our clients are common carriers. And with that, I have nothing else unless the court asks questions. All right. Thank you, counsel. The case just argued will be submitted, and that concludes our session. Please rise. This honorable court is now adjourned for the week. Thank you.
judges: BEA, COLLINS, LEE